# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OCEAN BAY MART, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF REHOBOTH | ) | C.A. No. 2019-0467-SG |
| BEACH, DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 9, 2021
Date Decided: October 13, 2021

Richard A. Forsten, Pamela J. Scott, and Elizabeth S. Fenton, of SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware, *Attorneys for Plaintiff Ocean Bay Mart, Inc.*

Max B. Walton and Lisa R. Hatfield, of CONNOLLY GALLAGHER LLP, Newark, Delaware, *Attorneys for Defendant The City of Rehoboth Beach, Delaware.*

**GLASSCOCK, Vice Chancellor**

The Ocean Bay Mart shopping center has been a Rehoboth landmark—perhaps not the city's most attractive—for decades. Located on Rehoboth's southwestern border—across Route 1 from the unincorporated area locals refer to as the "Forgotten Mile," the shopping center is owned by the Plaintiff Ocean Bay Mart, Inc., itself solely owned by Keith Monigle (together with Ocean Bay Mart, Inc., the "Plaintiff"). The Plaintiff intends to redevelop the property into 63 residences, organized as a condominium. In question is whether the Plaintiff developed vested rights to so redevelop before the Defendant City of Rehoboth Beach (the "Defendant" or the "City") enacted a current ordinance which requires that such a development—with many detached homes—requires a sub-division of the property, a step the Plaintiff wishes to avoid. The Plaintiff seeks a declaration that its rights vested prior to the enactment of the new ordinance, or that the City must be equitably estopped from enforcing the ordinance against it.

The equitable question here is a familiar one. A developer submits a development plan for governmental review; during the pendency of the review, the governmental entity amends the law, and the new law renders the development plan non-compliant. Does the new law apply, or does the developer get the benefit of review under the law as it formerly existed? Here, the matter has been tried, and the trial record presents, to my view, a rather close equitable case regarding vested rights. It is clear that the Plaintiff and its principal expended funds and forwent

1

income in the hopes of development under the old regime. It is also clear that Mr. Monigle was aware from the earliest planning stages that the City might prefer to impose a subdivision requirement on him, that he eschewed the chance to put tentative plans before the City to avoid "poking the beast," and that he therefore relied on rather obscure assurances from City officials that he would be able to proceed without subdivision. The City's code as it existed then was ambiguous as to whether subdivision was required; Mr. Monigle was clearly aware by the time the City's Building Inspector rejected the Site Plan in 2015 that the City espoused the view that subdivision was required.[1] City officials themselves were unclear and inconsistent in their interpretation of the code, making statements indicating that the project could proceed without subdivision. On balance, however, I find the Plaintiff did not reasonably rely on the prior City ordinances such that his rights became vested, and that equity requires neither a declaration to the contrary nor the application of estoppel against the Defendant.

The facts as developed at trial, and my reasoning therefrom, follow.

---

[1] The Board of Adjustment rejected the Building Inspector's decision, finding the City code ambiguous. The City thereafter amended the code in an attempt to cure the ambiguity.

# I. BACKGROUND[2]

For several years, Ocean Bay Mart, Inc., solely owned by Mr. Monigle, has sought to turn certain property in Rehoboth Beach into a condominium featuring 63 units, consisting mostly of detached dwelling houses, a development Mr. Monigle denominated "Beachwalk." The property consists of a single large lot of 7.71 acres, and at all times pertinent has been zoned C-1.[3] Lots zoned C-1, according to the City's "Table of Use Regulations," may be developed with single-family detached dwellings "[p]rovided that no more than one main building may be erected on a single lot."[4] During preliminary planning stages, associates of the Plaintiff spoke with various officials from the City of Rehoboth Beach regarding land use planning and density regulations. After the Plaintiff submitted the Beachwalk Site Plan application (the "Site Plan" or "Beachwalk") for approval, the City Building Inspector for Rehoboth Beach issued a letter indicating that the Site Plan could not go forward as described, explaining that he viewed the Site Plan outlined as a

---

[2] Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JX page ("JX _, at _").

[3] JX 13; JX 17.

[4] *See* Rehoboth Beach Code, Table of Use Regulations, at 1, 3 (2010); *see also* Rehoboth Beach Code § 270-10(C) (2015). The C-1 zoning code considers any use permitted in the R-2 District under Section 270-12(C) a use permitted as a matter of right. *See* Rehoboth Beach Code § 270-13(C) (2015). The R-2 zoning code, for its part, considers any use permitted in the R-1 District under Section 270-11(c) a use permitted as a matter of right. *See* Rehoboth Beach Code § 270-12(C) (2015). Finally, the R-1 zoning code incorporates all uses permitted under R-1(S) as a matter of right. *See* Rehoboth Beach Code § 270-11(C) (2015). The language at issue is drawn from the R-1(S) zoning code. Rehoboth Beach Code § 270-10(C) (2015).

subdivision, and not a condominium, under the City's Table of Use Regulations (the "Rehoboth Code" or the "Table of Use Regulations"). The Plaintiff appealed this finding to the Board of Adjustment for the Defendant, which determined that the City's applicable Table of Use Regulations was ambiguous, and overturned the City Building Inspector's decision on that basis. In response, the City's Planning Commission promptly changed the applicable law, enacting Ordinance No. 1116-01 and Ordinance No. 1016-02 (together, the "2016 Ordinances") presumably in an attempt to remove the ambiguity. Finally, in 2019, the Defendant's Planning Commission adopted Ordinance No. 0519-01, which made the 2016 Ordinances retroactively applicable to the Site Plan (together with the 2016 Ordinances, the "Ordinance Amendment").

The Plaintiff argues that he has vested rights in the law as it existed prior to the Ordinance Amendment, because he had already begun the approval process and expended funds to further his vision. He further argues that the Defendant is equitably estopped from requiring submission of the Site Plan as adapted to contemplate a major subdivision designation. This post-trial Memorandum Opinion assesses the questions of whether vested rights exist and whether equitable estoppel applies and concludes that neither does. Applicable facts that guide my decision are outlined below.

*A. Factual Background*

1. The Condominium Site Plan

Ocean Bay Mart is an existing shopping center in Rehoboth Beach seeking to reinvent itself as a residential development.[5]  After evaluating the options available, the Plaintiff decided to pursue a 63-unit development designated as condominiums, rather than as a major subdivision.[6]  Development as condominiums rather than as a subdivision would allow the Plaintiff to sidestep some of the more involved subdivision regulations.[7]  The Plaintiff then began developing the Site Plan, which ultimately was designed to include 58 single-family detached units and five single-family attached units.[8]  The Plaintiff contracted with Pennoni Associates Inc. ("Pennoni"), an engineering firm, in 2012, to assist with the Site Plan.[9]

At the time the Plaintiff began work on the Site Plan, the City's Table of Use Regulations stated that, in a commercial zoning area,[10] single-family detached dwellings were a permitted use "[p]rovided that no more than one main building may be erected on a single lot."[11]

---

[5] JX 25, at 1–2.
[6] JX 25, at 1–2.
[7] *See* Def.'s Opening Br. Supp. Its Mot. Summ. J. 5, Dkt. No. 40 [hereinafter "Def.'s MSJ Br."].
[8] JX 23, at 2.
[9] JX 25, at 4.
[10] Commercial zoning, C-1, is the applicable zoning designation for Ocean Bay Mart.  *See* City of Rehoboth Beach's Post-Trial Br. 5, Dkt. No. 72 [hereinafter "Def.'s Post-Trial Br."].
[11] Rehoboth Beach Code § 270-10(C) (2015).

## 2. Interactions with the City of Rehoboth Beach

Prior to submitting the Site Plan for approval, the Plaintiff in a circuitous manner sought assurances from City officials through communications with third parties.[12] In 2013, a real estate broker and personal friend of Mr. Monigle's, Kathy Newcomb, directed certain questions regarding condominium projects, densities, and layouts to Terri Sullivan, the then-acting City Building Inspector, to which Ms. Sullivan responded via email (the "August 26 email").[13] Ms. Newcomb's inquiry directly related to another, much smaller project of redevelopment in Rehoboth Beach.[14] Ms. Sullivan's response generally indicated that condominium projects did not require sub-division.[15]

In June 2014, the Plaintiff's attorney, Dennis Schrader, spoke with the City Solicitor, Glenn Mandalas, who confirmed that in general, a condominium plan is not a subdivision, and only requires site plan approval.[16] Again, the specific Beachwalk project was not part of this discussion.

---

[12] JX 25, at 3–4.

[13] *See* JX 01, JX 02. It appears that Ms. Sullivan and Ms. Newcomb exchanged at least one additional set of emails on the topic of Beachwalk. *See* JX 08. At that time, Ms. Sullivan indicated that the site plan review would be "the place to clarify whether these changes can occur." This recommendation suggests that Ms. Sullivan sought to encourage the Plaintiff to reach out through formal City channels regarding the intended development, rather than through ad hoc email exchanges. *Id.*

[14] *See* JX 01.

[15] *See* JX 02.

[16] *See* JX 22; *cf.* JX 06 (a contemporaneous email sent by Mr. Schrader to the Plaintiff). There is no record of the phone conversation between Mr. Schrader and Mr. Mandalas, but in any event, Mr. Mandalas does not dispute Mr. Schrader's recollection. *See* Pl.'s Post Trial Closing Statement Following Trial 3, Dkt. No. 73 [hereinafter "Pl.'s Post-Trial Br."].

On strength of these two rather opaque communications, the Plaintiff decided to proceed with the Site Plan. Various communications between the Plaintiff and his professionals during this time reference avoiding designation as any sort of subdivision.[17]

The Site Plan was submitted in June 2015.[18] A month later, David Mellen, the Chairman of Rehoboth Beach Planning Commission, reached out to the Plaintiff to inquire as to why the Plaintiff had not used the voluntary Project Concept Review process.[19] Use of the Project Concept Review would have allowed the Plaintiff to communicate directly with the Defendant regarding the proposed Site Plan before committing "substantial time and expense" to the preparation of a formal Site Plan.[20] The Plaintiff commented in an email to his associates that the process was one where "the perspective [sic] applicant lays out his cards and the town then has the opportunity adjust [sic] the code!"[21]

### 3. The Site Plan Application on Review

From July until November 2015, the City Building Inspector (originally Ms. Sullivan, and later Damalier J. Molina) and Pennoni traded correspondence pertaining to a number of flaws in the Site Plan that needed to be addressed before

---

[17] *See, e.g.*, JX 07, at 1–2; JX 04; JX 05.
[18] *See* JX 09.
[19] JX 10.
[20] *See* Rehoboth Beach Code § 236-31(A) (2015).
[21] JX 10.

the City's Planning Commission could move forward.[22]  This correspondence does *not* indicate that the Site Plan was improper because subdivision was required.[23]  On November 20, 2015, however, the City Building Inspector provided notice (the "2015 Letter") that the proposed Site Plan would need to be carried out as a subdivision rather than as a condominium.[24]

The Plaintiff appealed the 2015 Letter to the Board of Adjustment for the Defendant, arguing that the language of the City's Table of Use Regulations was ambiguous.[25]  The Board of Adjustment agreed and overturned the decision of the City Building Inspector in May 2016.[26]

On October 21, 2016, the Planning Commission unanimously voted that the Site Plan should be assessed as a major subdivision.[27]  On the same day, the Planning Commission voted to adopt Ordinance 1016-02, which requires that the primary entrance to any one- or two-family dwelling be located within 100 feet of a public street.[28]

On November 18, 2016, the Planning Commission adopted Ordinance No. 1116-06, amending Chapter 270 of the Rehoboth Code to clarify that no more

---

[22] JX 12; JX 13; JX 14; JX 16; JX 17.
[23] *See* JX 16.
[24] Transmittal Aff. of Max B. Walton, Esq., Ex. K, Dkt. No. 41 [hereinafter "Walton Aff."].
[25] *See* JX 19, at 2.
[26] *See id.* at 3–4.
[27] *See* Walton Aff., Ex. B.
[28] *See id.* at Exs. B and D.

than one single-family detached dwelling may be constructed on a lot in all zoning districts.[29]

The express language of each of the 2016 Ordinances states that "the City's Building and Licensing Department *shall thereafter* reject any *new application*" not in compliance with the ordinance.[30] Neither of the 2016 Ordinances provides any affirmative language "grandfathering in" applications already being processed.[31]

In December 2016, the Plaintiff informed the Planning Commission that it had no intention of filing as a major subdivision and would prefer to proceed with Site Plan review.[32] In response, the Planning Commission adopted a motion to reject the Site Plan unless the Plaintiff submitted a subdivision plan by March 14, 2017.[33] The Plaintiff appealed this decision to the City Commissioners, who upheld the Planning Commission in January 2018.[34]

The Plaintiff appealed to the Delaware Superior Court in February 2018.[35] The Delaware Superior Court reversed the City Commissioners and remanded the matter to the City, holding that the court could not "now determine whether

---

[29] *See id.* at Exs. A and C.
[30] *See id.* at Exs. C and D (emphasis added).
[31] *Id.*
[32] *See id.* at Ex. Y.
[33] *See* Pl.'s Opening Br. Supp. Mot. Summ. J., Ex. Q, Dkt. No. 36 [hereinafter "Pl.'s MSJ Br."].
[34] *See id.* at Ex. R.
[35] *See* Pet. Writ Cert., *Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2019 WL 112635 (Del. Super. Mar. 12, 2019) (C.A. No. S18A-02-001 THG).

Ordinance 1116-01 applies to 'Beach Walk,' reasoning that this issue should, in the first instance, be presented to and decided by the appropriate City officials."[36]

In May 2019, the Planning Commission adopted Ordinance No. 0519-01, which expressly requires that any applications that were submitted and pending for major subdivisions, minor subdivisions, site plan approval, partitioning or any other division of land as of the time of adoption of the 2016 Ordinances that had not been finally approved as of April 1, 2019 must comply with all requirements of the 2016 Ordinances prior to obtaining final approval.[37] Thus, for the Site Plan to be approved, the Site Plan must comply with the Ordinance Amendment.

*B. Procedural History*

The Plaintiff filed a Complaint in this Court on June 18, 2019 containing three counts: a claim of vested rights, a claim for declaratory judgment permitting the Plaintiff to proceed with the Site Plan free of the effect of any ordinances adopted after June 18, 2015, and a claim of equitable estoppel.[38] In September 2019, I denied a Motion to Intervene by certain third parties for failure to demonstrate a legally cognizable interest in the application of the 2016 Ordinances to the Plaintiff's property.[39] Discovery then proceeded. Both parties moved for summary

---

[36] *Ocean Bay Mart, Inc. v. City of Rehoboth Beach*, 2019 WL 1126351, at *2 (Del. Super. Mar. 12, 2019).
[37] *See* Walton Aff., Ex. I.
[38] Compl. Ocean Bay Mart, Inc. Equitable and Declaratory Relief, Dkt. No. 1.
[39] *See, e.g.*, Letter Op. and Order, Dkt. No. 23.

judgment.[40]  I denied each on the basis that the factual issue of good faith reliance was best resolved through development of a record at trial.[41]

I held trial in this matter on July 23, 2021, and counsel for the Plaintiff and the Defendant submitted post-trial closing statements to me on September 1, 2021.[42] I considered the matter fully submitted at that time.

## II. THE EVOLUTION OF THE VESTED RIGHTS DOCTRINE IN DELAWARE

### A. The Permit-Plus Test

The history of the vested rights doctrine's application in Delaware is tangled, due in part to modifications to the test used to assess a claim of vested rights.[43]  The Delaware Supreme Court adopted the "permit-plus" rule in *Shellburne, Inc. v. Roberts*, requiring that any claimant both hold a valid building permit issued prior to a zoning change as well as prove a "substantial change in position, expenditures, or incurrence of obligations, made lawfully and in good faith under the permit" in order to perfect vested rights.[44]

---

[40] *See* Pl. Ocean Bay Mart's Mot. Summ. J., Dkt. No. 36; Def. City of Rehoboth Beach's Mot. Summ. J., Dkt. No. 40.
[41] *See* Letter Op., Dkt. No. 56.
[42] *See* Tr. of 7.23.21 Trial, Dkt. No. 66 [hereinafter "Trial Tr."]; Def.'s Post-Trial Br.; Pl.'s Post-Trial Br.
[43] *See Acierno v. Cloutier*, 40 F.3d 597, 619–20 (3d Cir. 1994) ("What the above discussion concerning the district court's decision and the defendants' arguments on appeal demonstrates to us is that the vested rights law of both New Castle County and the State of Delaware at the time the County Council enacted Ordinance 91-190 was subject to considerable uncertainty and differing interpretations.").
[44] 224 A.2d 250, 281–83 (Del. 1966).

The "permit-plus" view prevailed for a number of years;[45] however, the fact-specific nature of the doctrine eventually led to a modification of the bright-line test. In *New Castle County v. Mitchell*, this Court assessed a claim of vested rights, purportedly under the "permit-plus" rule.[46] The analysis in *Mitchell* also included, among other things, three "considerations" the Court looked into when balancing the equities, each of which pertained to notice or the defendants' ability to foresee the change in zoning.[47] This emphasis on notice suggested a shift away from the pure permit-plus-substantial change position identified in *Shellburne*.

The evolution continued in *Wilmington Materials, Inc. v. Town of Middletown*.[48] The Court applied the "permit-plus" test to a claim of vested rights, but also indicated that it believed conduct of town officials induced substantial reliance (rather than merely a change in position, expenditures or incurrence of obligations).[49] Additionally, *Wilmington Materials* discussed the town's motivation for adopting the amendment at issue, questioning whether the changes were a valid

---

[45] *See, e.g., Raley v. Stango*, 1988 WL 81162 (Del. Ch. Jul. 28, 1988); *New Castle Cty. v. Mitchell*, 1981 WL 15144 (Del. Ch. Nov. 25, 1981); *Wilmington Materials, Inc. v. Town of Middletown*, 1988 WL 135507 (Del. Ch. Dec. 16, 1988); *E. Shore Envtl., Inc. v. Kent Cty. Dep't of Planning*, 2002 WL 244960, at *3 n.4 (Del. Ch. Feb. 1, 2002); *Miller v. Bd. of Adjustment*, 521 A.2d 642 (Del. Super. 1986).

[46] *Mitchell*, 1981 WL 15144.

[47] *Id.* at *6 (". . . (4) defendants had no knowledge or reason to know of the proposed zoning change, (5) there was no reason for defendants to suspect that the [permits] would not be granted . . . (7) there was no testimony of any substantial change . . . which would have put defendants on notice . . . .").

[48] *Wilmington Materials*, 1988 WL 135507.

[49] *Id.* at *8 ("Clearly the Town, acting through its officials, engaged in conduct that it knew or should have known would (and, in fact, did) induce substantial reliance by WMI.").

exercise of "police power" or whether the changes were targeted to prevent an otherwise lawful use of the land.[50] Thus, the universe of applicable fact considerations when faced with a vested rights claim in equity expanded.

*B. The Multi-Factor Good Faith Reliance Test*

The Delaware Supreme Court brought clarity to the vested rights doctrine in the 2002 case *In re 244.5 Acres of Land*, in which the Court stated that it did not "read *Shellburne* as promulgating a 'permit plus' standard which controls the issue of good faith reliance in all situations, such as are present here, where the permitting process is complex and multi-leveled."[51] Instead, the Court put forth a new test, which weighs "'such factors as the nature, extent and degree of the public interest to be served by the ordinance amendment on the one hand and, on the other hand, the nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded . . . .'"[52] "In the final analysis, good faith reliance on existing standards is the test."[53] Under this test, the issuance or non-issuance of a permit (as here) is a consideration, but is not case-dispositive.[54]

---

[50] *Id.* at *9.
[51] 808 A.2d 753, 757 (Del. 2002).
[52] *Id.* at 757–58 (quoting *Urban Farms, Inc. v. Borough of Franklin Lanes*, 431 A.2d 163,172 (N.J. 1981)).
[53] *Id.* at 758.
[54] *Id.*

In 2006, the defendants in *Salem Church (Delaware) Associates v. New Castle County* proposed adding a new element to the mix: timeliness.[55]  The *Salem Church* Court applied *In re 244.5 Acres*, assessing the public interest to be served by the ordinance amendment and the private interest of the plaintiff (as evidenced by expenditures and statements by county officials), finding that, on a motion to dismiss, the plaintiff's vested rights claim did not fail as a matter of law.[56]  The defendants asserted that the plaintiff's claim must fail due to delay.[57]  In considering this argument, the Court of Chancery stated that delay could defeat a vested rights claim, relying on language from *In re 244.5 Acres*; however, this statement is dicta, as the Court determined that a more fact-intensive inquiry would be necessary to determine whether delay defeated any vested rights from attaching.[58]

*In re Kent County Adequate Public Facilities Ordinances Litigation* followed *In re 244.5 Acres* and ultimately denied vested rights to the claimant.[59]  To reach this conclusion, the Court of Chancery assessed the following: the developer's progress in obtaining essential approvals; costs incurred;[60] the public interest

---

[55] 2006 WL 2873745 (Del. Ch. Oct. 6, 2006).
[56] *Id.* at *11.
[57] *Id.*
[58] *Id.* at *12; *see, e.g.*, *In re MFW S'holders Litig.*, 67 A.3d 496, 521 (Del. Ch. 2013) (discussing judicial statements on issues that are not outcome-determinative as dicta).
[59] 2009 WL 445386 (Del. Ch. Feb. 11, 2009), *rev'd sub nom. on other grounds*, *Chase Alexa, LLC v. Kent Cty. Levy Court*, 992 A.2d 1148 (Del. 2010).
[60] Although not expressly stated, the *In re Kent County* court appears to have considered obtaining approvals and expenditures as evidence of "nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded." *In re 244.5 Acres*, 808 2.Ad at 757–

14

advanced by the ordinance amendment; and good faith reliance.[61]  The good faith

reliance analysis included both consideration of notice to the claimants as well as

statements made by government officials.[62]  Here, the good faith reliance analysis

appears to have been carried out as its own separate prong, rather than as an

overarching principle applied to the factors to be weighed.

   *C. Town of Cheswold*

   *Town of Cheswold v. Central Delaware Business Park* is the latest word in

Delaware vested rights jurisprudence, but again, expounds on the existing test via

dicta.[63]  *Town of Cheswold* addressed the question of whether prior stipulated orders

in litigation proceedings prohibited a town from rezoning property; the Court

concluded that the town was permitted to carry out rezoning.[64]  In closing, the

Delaware Supreme Court reiterated the *In re 244.5 Acres* balancing test should be

applied if the business park raised a vested rights claim, but the Court's description

expands the precedent to include delay as a third, formal factor:

> The court should consider, among other factors it sees as important,
> "the nature, extent and degree of the public interest to be served by
> the ordinance amendment," "the nature, extent and degree of the
> developer's reliance on the state of the ordinance under which he
> has proceeded"—i.e., the developer's "good faith reliance on

---

58; *see In re Kent Cty.,* 2009 WL 445386 at *3 (discussing the consideration of expenditures and building permits in *In re 244.5 Acres*).

[61] *In re Kent Cty.,* 2009 WL 445386 at *3–8.

[62] *Id.* at *5–8.

[63] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810 (Del. 2018).

[64] *See generally id.*

existing standards,"—and "the effect of the pace of the development effort" because "delay may defeat a vested rights claim."[65]

The Delaware Supreme Court also, in a footnote, identified additional factors that might be assessed:

> Other factors a court may consider include: the ordinance's effects on public health and welfare—including safety, education, transportation, medical services, utilities, and environmental concerns; whether the developer incurred major expense or made material progress toward obtaining approval before the ordinance's enactment; any actions or statements made by municipality officials that the developer reasonably and substantially relied on; and whether the developer was on notice or had reason to anticipate the ordinance's enactment prior to incurring expenses on the project.[66]

While these factors are consistent with the factual scenarios explored in the caselaw above, this is the first formal recognition of these fact patterns as express factors to be considered.

In the final analysis, I conclude, where a municipal ordinance has changed while a property-use application is pending, the law simply requires an equitable balancing. The primary focus is the reason the ordinance has been amended, balanced against the reasonable reliance costs to the property owner. Without fetishizing the factors referred to in the case law as a "test," the various factors laid

---

[65] *Id.* at 821–22 (first quoting *In re 244.5 Acres*, 808 A.2d at 757–58; then quoting *Salem Church*, 2006 WL 2873745, at *12).

[66] *Town of Cheswold,* 188 A.3d at 822 n.62 (first citing *In re Kent Cty.,* 2009 WL 445386, at *4; then citing *Salem Church*, 2006 WL 2873745, at *10; then citing *Lynch v. City of Rehoboth Beach*, 2005 WL 1074341, at *2 (Del. Ch. Apr. 21, 2005); and then citing 4 *Rathkopf's The Law of Zoning and Planning* § 70:26 (4th ed. 2018)).

out above, culminating in *Town of Cheswold*, identify matters helpful to that balancing analysis.

## III. ANALYSIS

In order to determine whether the Plaintiff has obtained vested rights in his condominium plans, I apply the two-part test from *In re 244.5 Acres*, which inquires as to (1) the nature, extent, and degree of the public interest to be served by the ordinance amendment and (2) the nature, extent, and degree of the developer's reliance on the state of the ordinance under which he has proceeded, and assesses the developer's good faith reliance on existing standards as the final analysis.[67] In conducting this analysis, I consider certain of the factors the Delaware Supreme Court identified as applicable to the balancing analysis in *Town of Cheswold,* to the extent I find them applicable.[68] I note that the record does not demonstrate delay on the part of the Plaintiff such that a vested rights claim, otherwise viable, would be defeated.

After addressing vested rights, I also briefly address the Plaintiff's claim of equitable estoppel.

---

[67] *In re 244.5 Acres*, 808 A.2d, at 757–58.
[68] *Town of Cheswold,* 188 A.3d at 822 n.62 (first citing *In re Kent Cty.,* 2009 WL 445386, at *4; then citing *Salem Church*, 2006 WL 2873745, at *10; then citing *Lynch*, 2005 WL 1074341, at *2; and then citing 4 *Rathkopf's The Law of Zoning and Planning* § 70:26 (4th ed. 2018)).

17

*A. The Plaintiff has not secured vested rights.*

As this Court has noted previously, there is no bright line test or objective formula for determining whether vested rights have attached.[69] Thus, the question is not merely whether more factors militate for the Plaintiff over the Defendant; rather, I must conduct an equitable balancing under the record before me.[70]

## 1. Public Interest in the Ordinance Amendment

The first prong of the *In re 244.5 Acres* test directs me to inquire into the public interest behind enacting the Ordinance Amendment.[71]

There are two 2016 Ordinances.[72] The first, Ordinance 1016-02, requires that the primary entrance to any one- or two-family dwelling be located within 100 feet of a public street.[73] The notice adopting Ordinance 1016-02 discusses the State of Delaware's Fire Prevention Regulations and their identified standards for access to all types of buildings, including residential buildings, and indicates that this ordinance is the best way to ensure emergency services can adequately access all residential dwelling units.[74]

---

[69] *See In re Kent Cty.*, 2009 WL 445386, at *4.
[70] *See, e.g., id.* at *8 (discussing the "required balancing" and "greater emphasis" to be placed upon certain factors in assessing good faith reliance).
[71] *In re 244.5 Acres*, 808 A.2d at 757.
[72] The 2019 Ordinance clarifies that the 2016 Ordinances apply to Beachwalk. I need not decide whether those Ordinances, as enacted, so applied, since I find no reasonable reliance on the pre-2016 Code by the Plaintiff, in any event.
[73] *See* Walton Aff., at Ex. D.
[74] *See id.*

Ordinance 1116-01 adds a new section to the Rehoboth Code to prevent more than one single-family detached dwelling from being constructed upon any commercially zoned lot.[75] Ordinance 1116-01 specifically states that its intent is "to affirm the Building Official's interpretation of the referenced code provision" (that is, that erection of multiple detached homes on a single lot requires sub-division) and to remove any uncertainty in the Code's application.[76]

The public interest behind Ordinance 1116-01 is an administrative interest in clarity in the Rehoboth Code. A further interest, I presume, is strengthening the City's control over use of property in the C-1 zone, including regarding residential density.[77] The public interest driving Ordinance 1016-02 is more compelling. It requires proximity to public streets to provide access for fire and emergency vehicles, and is thus predicated on public health and safety. Both of the 2016 Ordinances represent an exercise of the City's police powers, in the public interest.[78] Therefore, I find that this factor weighs in favor of the Defendant.

### 2. Developer's Reliance on the Prior Ordinance

The real gravamen of the issue here is the extent of the Plaintiff's reliance on existing law, and the reasonableness of that reliance under the circumstances.

---

[75] *See id.* at Ex. C.
[76] *See id.*
[77] It appears that if the Ocean Bay Mart property is subdivided, fewer detached homes will be permitted than called for in the Site Plan. *See* JX 19.
[78] *See Wilmington Materials, Inc.*, 1988 WL 135507.

19

Assessing the nature, extent, and degree of the developer's reliance on the prior ordinance is critical to resolving the question of whether vested rights exist, as the *In re 244.5 Acres* Court identified when it stated that good faith reliance on the existing standards was the "final analysis."[79]

A close reading of a recent Delaware vested rights case, *In re Kent County*, illuminates the proper way to evaluate this factor.[80] In that case, a developer had purchased land to construct a residential community, engaging engineers, pursuing preliminary land use approvals with the government, and incurring material expenses.[81] Approximately six months into this planning process, the developer discovered that the applicable ordinance permitting the development might be amended.[82] Despite this, the developer continued to pursue its project; during this time, certain government officials made statements indicating that the developer's project, along with others in the application "pipeline," would be grandfathered.[83] After the adoption of the new ordinance, the project was in fact not grandfathered, and the developer asserted a claim of vested rights, which the *Kent County* Court denied.[84] In making this determination, the Court applied the *In re 244.5 Acres* test,

---

[79] *In re 244.5 Acres*, 808 A.2d at 758.
[80] *See generally In re Kent Cty.*, 2009 WL 445386.
[81] *Id.* at *1.
[82] *Id.*
[83] *Id.*
[84] *Id.* at *7–8.

evaluating good faith reliance by the developer by questioning first whether there was in fact reliance and then whether such reliance was reasonable.[85]

A number of circumstances must be considered to determine whether the Plaintiff reasonably relied on existing Rehoboth Code standards in 2015.

### a. The Plaintiff's Knowledge of the Rehoboth Code

The Plaintiff purports to have relied on the Rehoboth Code as it existed at the time it submitted its Site Plan, together with statements made by City officials.[86]  It cites, however, to no section of the Rehoboth Code explicitly permitting a condominium development in contradiction to the permitted uses of property otherwise provided in the Rehoboth Code.  Unlike more typical vested rights cases, this is not situation where the law *ante* clearly permitted a use, later prohibited by new legislation.  Here, the applicable provision is the Defendant's Table of Use Regulations as of 2015, and the underlying sections of the Rehoboth Code providing "uses of right" for zone C-1, which state that single-family detached dwellings were a permitted use of a commercially zoned lot "[p]rovided that no more than one main building may be erected on a single lot."[87]  This language does not support the view

---

[85] *Id.* at *5–8 ("[The developer] identifies four discrete events which, in its view, demonstrate both its reliance on the pre-APFO standards of subdivision regulation and the reasonableness of that reliance.").

[86] "[A]t the time Ocean Bay Mart filed its Site Plan, it had not only read the City Code, but it had confirmed with the City Building Inspector and the City Solicitor that its reading of the Code was correct."  Pl.'s Post-Trial Br. 3.

[87] Rehoboth Beach Code § 270-10(C) (2015).

that no subdivision was required. Mr. Monigle testified at trial that he had never read this language prior to 2015, and thus had no reason to rely on any particular interpretation of the Code at the time the Site Plan was submitted, outside of the statements of City personnel.[88]

### b. Research into the Rehoboth Code by the Plaintiff's Associates

The Plaintiff, who did not have experience in real estate development, and who faced a sizable investment in redeveloping the Ocean Bay Mart property, turned to others to assist.[89] Among these were Mr. Schrader, the Plaintiff's attorney, and Ms. Newcomb, a friend who is also a real estate broker.[90] As outlined above, both Mr. Schrader and Ms. Newcomb engaged in conversations with City officials regarding Beachwalk.

Mr. Schrader confirmed with the City Solicitor that a condominium is not a subdivision, and is assessed under different standards for purposes of Planning Commission review.[91] This general confirmation was surely of interest and encouragement to the Plaintiff, but it is insufficient, in my view, to provide a basis for reasonable reliance that the Site Plan, in particular, would constitute a

---

[88] *See* Trial Tr., 39–44.
[89] *See, e.g.*, *id.* at 54:20–22 (discussing hiring Mr. Schrader); *id.* at 11 (discussing the help of Ms. Newcomb, the realtor, who appears to have assisted as a personal friend of Mr. Monigle's).
[90] *Id.*
[91] *See* JX 22.

condominium rather than a subdivision.[92]  The Plaintiff notes that other condominium developments had been permitted in the City apparently without requiring a subdivision even where the condominium developments led to a higher density than that proposed by the Beachwalk Site Plan.[93]  The Plaintiff did not offer evidence regarding the state of the Rehoboth Code when these condominiums were developed, however, nor explain why deviation from the "one main building" per lot standard was permitted.[94]

Likewise, Ms. Newcomb's discussion with the then-acting City Building Inspector, Ms. Sullivan, and Ms. Sullivan's August 26 email in response, support the Plaintiff's position that it understood no subdivision would be required.  Neither discussion nor email referenced the Beachwalk project at all, however, and the project they did concern was of a different scale and planning zone.[95]  Like the conversation between Plaintiff's counsel and the City Solicitor, the August 26 email can be rightfully seen as encouraging to Plaintiff's hopes to avoid subdivision, but does not in itself justify a finding of reasonable reliance.  This is particularly so in

---

[92] In the course of researching and planning the Beachwalk redevelopment, one of the Plaintiff's own attorneys, Michael Smith, indicated that he believed Beachwalk would require the submission of a subdivision plan.  *See* JX 03.  In conjunction with the Plaintiff's admitted lack of knowledge of the Rehoboth Code, this belief by one of its agents weakens any reliance value that the Plaintiff attributed to Mr. Schrader's conversation with the City Solicitor.  Mr. Monigle testified at trial that Mr. Smith later changed his mind regarding whether a subdivision would be required, but did not proffer further evidence on this point.  *See* Trial Tr. 51:21–22.

[93] Pl.'s Post-Trial Br., 4 n.5.

[94] Def.'s Post-Trial Br., 5 n.6.

[95] JX 02.

23

light of the Rehoboth Code language allowing no more than one detached residence "main building" on a single lot; Beachwalk, as conceived in the Site Plan, called for more than *sixty* such homes. Again, Mr. Monigle had not read the Code, but he is charged with knowledge of it for purpose of determining reasonable reliance. Ms. Sullivan's email was not an official, or even an unofficial, approval of Beachwalk itself; in fact, Sullivan never purported to approve the Site Plan, although she also did not suggest that it required subdivision.[96] The August 26 email might have been of some preliminary reliance value to the Plaintiff, but in context of the further Beachwalk-specific review to come, the Plaintiff could not reasonably rely on the August 26 email as a full and final statement of the law. Indeed, as discussed below, the new City Building Inspector, upon review of the actual Site Plan, opined in November 2015 that Beachwalk required a subdivision under existing law.

### c. The Plaintiff's Later Arguments That the Rehoboth Code Is Ambiguous

The Plaintiff promptly appealed the City Building Inspector's adverse ruling—that subdivision was required under the Code and its Table of Use Regulations—to the City Board of Adjustment. The nature of the appeal I find pertinent to the reasonable reliance analysis. The City Building Inspector had rejected the Site Plan on the ground that it provided for "more than" one main

---

[96] *See* JX 11.

building on the Plaintiff's lot—in fact, there were dozens—and thus was inconsistent with the Code, absent subdivision.[97]  In the appeal, the Plaintiff's attorney argued that the Table of Use Regulations was ambiguous, and could be read to support condominium development without subdivision.[98]  That argument was successful, and the Board of Adjustment overturned the City Building Inspector's determination *on grounds of ambiguity*.[99]

I note that zoning restrictions limit full use of real property, in derogation of the common law, and that as a result ambiguity is resolved in favor of the property owner.[100]  The Plaintiff argued successfully before the Board of Adjustment that the Table of Use Regulations was ambiguous, and thus established that the Site Plan was in compliance with the then-ordinances, once the ambiguity was resolved in its favor.  The issue here, however, is quite different.  Having made the ambiguity argument, the Plaintiff was on notice that the City may have intended the more restrictive interpretation, and thus might clarify the law to accomplish that intent (as, in fact, it did). In other words, the Plaintiff is in the uncomfortable position of asking this Court to find that it reasonably relied on the fixed nature of an ordinance that it

---

[97] *See* Walton Aff., Ex. K.

[98] *See* JX 20, at 27:5–20.

[99] *See generally* JX 20.

[100] *See Carl M. Freeman Assocs., Inc. v. Green*, 447 A.2d 1179, 1182 (Del. 1982) (citation omitted) ("Because zoning ordinances are in derogation of common law property rights, [there must be] strict compliance with the [legislated] procedures."); *Dewey Beach Enters., Inc. v. Bd. of Adjustment*, 1 A.3d 305, 310 (Del. 2010).

has acknowledged was ambiguous, and which it knew the City construed as requiring subdivision.

The Board of Adjustment appeal was important for another reason. It commenced a season of litigation in which the City made clear its intention that subdivision would be required for the Plaintiff's redevelopment.[101]

### d. *Statements Made by Municipal Officers*

The Plaintiff puts forth as further support for his position a number of statements made by municipal officers indicating that the Ordinance Amendment would not apply to the Site Plan.

First, the Plaintiff points to a local newspaper story that included comments from the City Mayor indicating that the 2016 Ordinances would not apply to the Beachwalk project.[102] Additionally, the Plaintiff refers to certain comments made during a public workshop for the 2016 Ordinances, wherein one of the City Commissioners and the Mayor engaged in commentary as to whether the 2016 Ordinances would apply to Beachwalk, ultimately suggesting that because the Site Plan application was already before the City Building Inspector that the 2016

---

[101] For instance, the City has at various times relied, unsuccessfully, on a State statute, the Delaware Uniform Common Interest Ownership Act, to argue that detached houses as part of a condominium development constitute separate parcels of real estate. *See* 25 *Del. C.* § 81-105(b)(1) (2009).

[102] Pl.'s MSJ Br., Ex. X, at 2 ("[Mayor] Cooper said the proposed changes will not apply to the Beach Walk project because it would be considered grandfathered.").

Ordinances would not apply.[103]  The City Solicitor at the same workshop indicated that the 2016 Ordinances were to be prospective in nature.[104]

In a further City Commissioners' meeting on September 16, 2016, the City Solicitor made a number of related statements while discussing whether the 2016 Ordinances would apply to Beachwalk, explaining that Beachwalk could proceed on theories of vested rights or equitable estoppel to attempt to avoid the effect of the 2016 Ordinances.[105]  He stated that, while he had not yet considered whether either doctrine could apply in full, "because [the Plaintiff is] already in the pipeline, this ordinance would probably not be applicable to them. Again, I haven't done the full analysis."[106]  The City Solicitor went on to say that he didn't "think [the 2016 Ordinances did] anything to the [Beachwalk] application that's pending, unless there's a reason to hold that application."[107]

Despite these statements, in May 2019 the Defendant adopted an ordinance that directly applied the 2016 Ordinances to any pending applications, including Beachwalk.[108]

---

[103] *See* Pl.'s MSJ Br., Ex. Y.
[104] I note that the evidence supporting these statements is excerpted in nature, meaning that I am without the benefit of context to review these statements. *See id.*
[105] *See generally* Walton Aff., Ex. T.
[106] *See id.* at 44:22–23.
[107] *Id.* at 45:22–23.
[108] *See id.* at Ex. I.

In these circumstances, could the Plaintiff reasonably rely upon these municipal officers' statements to perfect a claim of vested rights? I find that it could not. In *In re Kent County*, the Court of Chancery indicated that a statement by the President of the Levy Court could not bind "his fellow members," as he is but a single member.[109] This Court indicated that "[the Plaintiff], understandably, may have taken heart from the President's comments; substantial reliance was not, however, justified."[110] Similarly, a single Commissioner's statements at a public workshop cannot bind the City's Planning Commission in its entirety, nor can the commentary of the Mayor or the City Solicitor. Additionally, the City Solicitor was careful to qualify his statements at the September 2016 workshop, noting that he had not performed the full analysis to conclude as to whether the 2016 Ordinances would have retroactive effect.[111] It would therefore not be reasonable for the Plaintiff to substantially rely upon these statements. Statements of the Mayor, reproduced in a city newspaper, likewise cannot bind the City's Planning Commission and are not a suitable basis for substantial reliance.

### e. The Plaintiff's Election to Forego Project Concept Review

The Plaintiff chose not to participate in the Project Concept Review process offered by the Defendant, which would have afforded an opportunity to discuss and

---

[109] *In re Kent Cty.*, 2009 WL 445386.
[110] *Id.*
[111] *See* Walton Aff., Ex. T, 44:22–23, 45:22–23.

design the Site Plan in close contact with the City.[112] Project Concept Review is voluntary, not mandatory,[113] and the Plaintiff was not required to participate. Had the Plaintiff done so, and had the City agreed to the Site Plan under the process, that would support the Plaintiffs reasonable reliance argument.[114] Conversely, since the Plaintiff chose not to undertake Project Concept Review, this cannot bolster its reliance argument. In fact, the Plaintiff's reason for eschewing review is telling; Mr. Monigle wished to avoid bringing attention to the subdivision issue out of fear that the City might amend its law in a way adverse to his interest.[115] The Plaintiff wrote in a 2015 email that he had received an inquiry as to why Ocean Bay Mart hadn't taken advantage of the Project Concept Review, and described his wish to avoid a process which might cause the City to "adjust the [Rehoboth] Code!"[116] This may (or may not) reflect prudence, but is incompatible with reasonable reliance on the pre-2016 Code.

\* \* \*

---

[112] *See* Pl.'s MSJ Br., Ex. H ("[Y]ou decided to waive your rights to a Planning Commission concept review as permitted under city code Section 236-31 *Project concept review*. This would have been an opportunity to review the potential development before committing substantial time and expense in the preparation of the site plan . . . .").

[113] *See id.* (referring to the Plaintiff's "right[]" to engage with the project concept review process).

[114] *In re Kent Cty.*, 2009 WL 445386, at \*4 (mentioning concept plan approval as part of the developer's progress along the "regulatory pathway").

[115] *See supra* notes 19–21 and accompanying text.

[116] *See* JX 10.

In sum, I cannot find that the Plaintiff reasonably relied upon the language of the Rehoboth Code as it existed in 2015. It is true that the Plaintiff here has hired engineers and consultants[117] and has expended a substantial sum of money pursuing this development, hoping to proceed without subdivision. Prior to the 2016 Ordinances, the Plaintiff avers it had invested over $576,000 in costs, expenses, and lost rent in pursuing Beachwalk.[118] Of course, this does not demonstrate a loss to the Plaintiff of that amount. Assuming that the Plaintiff goes forward with a subdivision, the record is barren of what amount of the sums already expended will be applicable to the project. Nonetheless, the Plaintiff has made a significant and material investment here. Because I find that Mr. Monigle cannot reasonably have relied on the continued applicability of the ambiguous language of the Rehoboth Code to his project, the out-of-pocket costs and forgone rent hold little equitable suasion.

The Plaintiff's lack of knowledge regarding the Rehoboth Code and later arguments that the Rehoboth Code itself is ambiguous regarding its project preclude me from finding that the Plaintiff's reliance was reasonable. The fact that the Plaintiff's associates engaged in nonspecific research with various city officials and

---

[117] See supra note 9 and accompanying text.

[118] See Pl.'s Post-Trial Br., at 15 n.12. With respect to lost rent, Mr. Monigle testified that he lost tenants as a result of his decision to offer only short-term leases, to facilitate redevelopment. See Trial Tr., 27:3–24, 28:1–13.

that certain municipal officers made nonbinding statements indicating that no subdivision would be required, or that the 2016 Ordinances would not apply, I find insufficient in equity to support a finding of vested rights. The record reflects that the Plaintiff was well aware, by the time of the City Building Inspector's decision in November 2015, that the City understood the Rehoboth Code to require subdivision. Having successfully argued that the Rehoboth Code was ambiguous in appeal of that decision, it was aware of the potential that the City would look to eliminate that ambiguity.[119] As early as July 7, 2015, Mr. Monigle had written in an email that he had received an inquiry as to why Ocean Bay Mart had not taken advantage of the optional Project Concept Review, and described the process as giving the City the chance to "adjust the [Rehoboth] Code!"[120] Acknowledgement that the City might have a motive to change the Rehoboth Code constitutes reason to anticipate the 2016 Ordinances and their eventual application to Beachwalk.

Under all these circumstances, the Plaintiff's reliance on the legal status quo was not reasonable, and equity will not impose relief under the doctrine of vested rights.

---

[119] *See* Trial Tr., 39–44.
[120] *See* JX 10.

31

*B. The Defendant is not equitably estopped from requiring a major subdivision plan.*

The doctrine of equitable estoppel can be used to prevent a municipal government from exercising its zoning powers where "'a landowner [is] induced to expend substantial sums in reasonable, good faith reliance upon governmental assurances (or equivalent conduct) that the landowner's intended use of the property is permitted under the zoning code.'"[121]

Equitable estoppel and vested rights doctrines are "theoretically distinct," but generally "reach the same results in similar factual situations."[122] So it is here. As delineated above, the Plaintiff has not made a showing of *reasonable*, good faith reliance upon governmental assurances, as it was not reasonable for the Plaintiff to rely upon the Mayor's and the Commissioners' informal statements as to whether Beachwalk would be grandfathered and thus exempt from the application of the 2016 Ordinances. By contrast, the Plaintiff should have been (and was) on notice that the City might seek to change the Table of Regulations via the Ordinance Amendment— even if the applicable law in 2015 did include an ambiguity he might exploit.[123]

---

[121] *See DiSabatino v. New Castle Cty.*, 781 A.2d 698, 702 (Del. Ch. 2000) (quoting *Wilmington Materials*, 1988 WL 135507 at *5).

[122] *Miller v. Bd. of Adjustment*, 521 A.2d 642, 645 (Del. Super. 1986).

[123] *See, e.g.*, *supra* notes 19–21 and accompanying text.

## IV. CONCLUSION

The Plaintiff has not secured vested rights, and the Defendant is not equitably estopped from requiring a major subdivision plan. Therefore the 2016 Ordinances shall apply to Ocean Bay Mart, Inc. in full. The parties should submit a form of order consistent with this Memorandum Opinion.